Filed 3/13/25  In re R.N. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re R.N., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E084930 |
| Plaintiff and Respondent, | (Super.Ct.No. SWJ2200228) |
| v. | OPINION |
| J.C., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Kelly L. Hansen, Judge. Affirmed.

Tracy M. De Soto, under appointment by the Court of Appeal, for Defendant and Appellant.

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Prabhath Shettigar, Deputy County Counsel, for Plaintiff and Respondent.

1

Defendant and appellant J.C. (Mother) appeals the termination of her parental rights to R.N. (a boy; born December 2019) (Minor) at a Welfare and Institutions Code section 366.26[1] hearing. Mother contends the juvenile court erred by finding that she had not met the three prongs of *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*) in finding that the beneficial parental bond relationship exception of section 366.26, subdivision (c)(1)(B)(i), did not apply and by terminating her parental rights.

**FACTUAL AND PROCEDURAL HISTORY**

A. <u>DETENTION</u>

On or about March 31, 2022, Mother and Minor's father, M.N. (Father; collectively, Parents) were arrested for identity theft. Earlier, Parents had been seen on store video using a stolen credit card; Father had Minor with him. Parents' home was searched by police pursuant to a search warrant. During the search, methamphetamine, heroin and needles were found inside the home. Minor and his 14-year-old sibling, C.G.,[2] were asleep in the home and the drugs and paraphernalia were accessible to them. Maternal grandmother (MGM) took custody of Minor and C.G. When Mother was arrested, she was "under the influence of drugs" (she tested positive for methamphetamine and amphetamines) and was found to have methamphetamine and paraphernalia in her purse. Mother admitted using methamphetamine daily.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] C.G. is not a subject of the instant appeal; he has a different father than Minor.

MGM reported domestic violence between Parents. MGM had observed bruises on Mother in the past. Mother had a history of alcoholism and drug use. In the prior two weeks, Mother had left Minor and his other sibling, three-year-old S.S.[3] with MGM more than usual. C.G. was interviewed and denied seeing drugs in the house but admitted that Mother had previously used drugs. Mother was interviewed and admitted Father was abusive to her. She also relapsed on methamphetamine in February 2022. Mother was released from jail on April 5, 2022. Minor remained in MGM's care. Mother refused to complete a hair follicle or urinalysis drug test for the Department.

The Department determined after a meeting with Mother where she appeared to be under the influence, and after Father had been arrested a second time, that a protective custody warrant removing Minor from their care was required. MGM was approved for placement.

Mother had been involved in prior dependency proceedings for S.S. and C.G., which were related to her using drugs or alcohol. Mother had several prior convictions for driving under the influence in 2010, 2011 and twice in 2012. She had the ongoing case where she was charged with identity theft, grand theft over $950, mail theft and petty theft.

The section 300 petition was filed on May 11, 2022. It was alleged as to Minor, failure to protect under section 300, subdivision (b), by Mother, that: (b-1) Mother abused controlled substances, including methamphetamine, and left drugs and

_____

[3] S.S. is not a subject of the instant appeal; she has a different father than Minor and C.G.

paraphernalia accessible to Minor; (b-2) Mother had a history of abusing controlled substances including alcohol; (b-3) Mother engaged in domestic violence with Father; (b-4) Mother had a prior case history with child welfare services and failed to benefit from previous services; and (b-5) Mother had a criminal history including driving under the influence and other crimes.

The detention hearing was held on May 13, 2022; Mother was present. Father was named the presumed father of Minor. The juvenile court found a prima facie case for detention of Minor from Parents and he was placed with MGM. Mother was granted supervised visitation two times each week up to one hour each visit.

B.      JURISDICTION/DISPOSITION REPORT AND HEARING

The jurisdiction/disposition report was filed on June 1, 2022. The Department sought to have the juvenile court find the b-1 through b-5 allegations against Mother alleged in the petition true by a preponderance of the evidence. There was sufficient evidence of Mother's drug use based on her being under the influence when arrested, having methamphetamine in her purse, and having admitted to a social worker that she had relapsed. MGM reported domestic violence between Parents, Mother had previous children's services history and a criminal history. Mother should be granted reunification services for Minor. Minor remained in MGM's care. He was healthy and there were no medical concerns.

4

Mother completed a saliva drug test prior to visitation on May 27, 2022, and tested positive for methamphetamine. Mother was unable to complete a follow-up urine test. Mother was allowed to visit with Minor. Mother was referred to substance abuse treatment, counseling, domestic violence classes and parenting education.

An addendum report was filed on July 7, 2022.[4] It was recommended that Minor remain with MGM and that reunification services be granted to Mother. Mother had visits with Minor and his siblings on June 13, 14, and 22, 2022. Mother was affectionate and loving. She played with Minor. She brought games and snacks. Minor hugged Mother. Mother was 20 minutes late for a visit on June 28, 2022, but the visit went well once she arrived. On July 5, 2022, Mother was given a saliva drug test prior to a visit with Minor and tested positive for methamphetamine and amphetamine. She refused an on-demand urine test. The visit was allowed to continue and Mother was appropriate during the visit.

An addendum report was filed on August 10, 2022, by the Department. Mother advised the Department she had enrolled in substance abuse classes and counseling. She was waiting for her domestic violence class to begin and had started her parenting class. She had to reenroll in the drug treatment program to accommodate her visitation schedule with Minor. Despite agreeing to do a hair follicle test, she advised the Department that she had missed the test on July 20, 2022. Mother insisted she took the test on July 21, 2022. Mother took a saliva drug test on August 2, 2022, and it was "inconclusive." She

---

[4] An amended petition was filed on July 13, 2022, but there were no changes as to the allegations against Mother for Minor.

5

was advised by the Department to submit to a urine test. She was allowed to visit with Minor as she did not appear to be under the influence. On August 4, 2022, Mother did not attend visitation. Further, Mother had not attended her substance abuse classes since June 1, 2022. The social worker attempted to contact Mother several times about her status in a substance abuse program but received no response.

Mother had a visit with Minor and his siblings on July 12, 2022. A saliva drug test was positive for methamphetamine. Minor hugged Mother during the visit and again at the end of the visit. Another visit was held on July 19, 2022. Mother's saliva drug test was negative. Mother brought clothing and gifts to the visit. She read a book to Minor. Mother was appropriate and loving. Mother had another visit with Minor on August 2, 2022, and her saliva drug test was "inconclusive." The visit went well.

The jurisdiction/disposition hearing was held on August 15, 2022. Mother was not present but her attorney represented that Mother submitted on the reports of the Department and had completed a waiver of her right to a trial. The juvenile court found the section 300 allegations (b)(1) through (b)(5) true by a preponderance of the evidence. Minor would remain with MGM and Mother was granted reunification services.

C.     STATUS REVIEW REPORTS

In the six-month status review report filed January 9, 2023, the Department recommended continued reunification services for Mother with authorization for placement of Minor after 60 days of consistent negative drug test results, and authorization for overnight, unsupervised and weekend visits. Minor had been with MGM since May 9, 2022. Mother had obtained housing and employment during the

6

reporting period. The criminal charges that brought Mother to the attention of the Department were still pending.

Mother had completed domestic violence and parenting classes. She had further counseling to complete. Mother had been discharged from her substance abuse program on November 9, 2022, for failing to attend. She had a reenrollment date of January 11, 2023. Mother had a negative hair follicle test on July 26, 2022. She had no positive tests since that date. Mother was a no-show for four random drug tests in December 2022. She had a negative hair follicle test on December 19, 2022.

Mother regularly attended visits with Minor during the reporting period. Mother's visits had increased to four hours a week of unsupervised visits. Monitored visits involved Minor and his siblings. Mother played music so the children could dance and she brought games. It was evident that Mother had a bond with Minor. The Department sought to have Mother be given more reunification services so she could complete her substance abuse treatment and counseling in hopes of returning Minor to her care.

An addendum report was filed on February 8, 2023. The Department was recommending termination of Mother's reunification services and decrease of visits to one time each week, supervised. As of February 2, 2023, Mother had not reenrolled in a substance abuse treatment program; she insisted it was the program's fault. Mother was a no-show for five drug tests during this reporting period.

The six-month review hearing was held on February 14, 2023. The Department had met with Mother's counsel and was recommending continued reunification services for Mother. The juvenile court continued reunification services for Mother.

7

The 12-month status review report was filed on June 1, 2023.  The Department recommended that Mother's reunification services be terminated and that a section 366.26 hearing be set.  Minor was still placed with MGM.  Mother had housing but was no longer employed.  On August 25, 2022, mother was arrested for possession of drug paraphernalia and for driving on a suspended license.  Her other charges were pending.  Minor was thriving in MGM's care and MGM was willing to adopt Minor.  Mother had not been in consistent contact during the reporting period.

Mother had been participating in individual counseling.  Mother claimed to be participating in a 12-step program and an online sobriety program.  However, the online program did not have a record of Mother's attendance.  Mother had not enrolled in a substance abuse program during the reporting period.  Mother had not submitted to a hair follicle test and was a no-show for four drug tests in March 2023.  Mother had a positive test for methamphetamine on February 23, 2023.  Mother was either a no-show or could not provide saliva for drug tests in April 2023.

On April 5, 2023, visits were changed to supervised based on Mother having a positive drug test.  MGM supervised the visits.  The Department stated that it would be a detriment to move Minor back with Mother as she had failed to address her substance abuse issues.

An addendum report was filed on June 29, 2023.  Mother tested positive for methamphetamine in a saliva test on June 9, 2023, prior to a visit with Minor.  Mother contested the results and was sent for a urine test; she was a no-show for two tests.

Attempts to contact Mother to set up another test or have her explain her failure to test were unsuccessful.

An addendum report was submitted on August 10, 2023. Mother was a no-show for two scheduled hair follicle tests. Mother had checked into a substance abuse recovery center but then left the same night. Mother had no visits with Minor since July 7, 2023, and had not submitted to any saliva tests since that date. The Department confirmed it was in constant contact with Mother by text messages or phone calls. Mother's criminal charges were still pending.

The 12-month review hearing was held on August 16, 2023. Mother submitted on the Department's reports. The juvenile court terminated Mother's reunification services and set the matter for a section 366.26 hearing.

D.       SECTION 366.26 REPORT AND HEARING

The Department filed a section 366.26 report on November 28, 2023, seeking an additional 90 days to assess MGM for adoption. The permanent plan was adoption. Mother had not been consistent with visits with Minor during the reporting period. She consistently tested positive for methamphetamines in saliva tests prior to her visits but was coherent enough to complete the visits. Mother had four positive on-demand drug tests during the reporting period. She was a no-show for six of the tests. Minor's needs were being met by MGM; she was providing a safe, loving and appropriate home for Minor. The juvenile court continued the section 366.26 hearing several times. An adoption assessment was completed for MGM.

9

An addendum report was filed on March 7, 2024. It was recommended that Minor be freed for adoption by MGM, that Mother's parental rights be terminated and that visits with Mother be reduced to one time each month. Mother had participated in some substance abuse treatment since January 2024. Mother had been visiting with Minor with MGM supervising the visits. MGM expressed concern that Mother was using drugs again, and MGM did not want to continue the visits if she was under the influence. MGM sought to have the Department supervise visits. Mother had difficulty producing saliva for saliva tests, was a no-show for several tests and tested positive for methamphetamine on February 16, 2024. The section 366.26 hearing was continued several more times.

Another section 366.26 report was filed on May 29, 2024. During the review period, Mother had avoided contact with the Department and her current whereabouts were unknown. Minor was healthy and was attached to MGM. Mother had not had in-person visits with Minor since March 28, 2024; she had some video visits according to MGM. Mother continued to be a no-show for drug tests.

At a hearing on June 12, 2024, Mother's counsel requested a continuance of the section 366.26 hearing in order for a bonding study to be completed. The juvenile court ordered that Minor be made available for a bonding study before July 15, 2024. Another continuance was granted by the juvenile court.

An addendum report was submitted by the Department on July 31, 2024. Mother had a negative hair follicle test on May 25, 2024. Mother was arrested on June 8, 2024, and charged with several counts of felony grand theft and misdemeanors including

possession of a controlled substance, possession of drug paraphernalia and driving under the influence. MGM expressed concerns about Mother being out all night, bringing home " 'shady looking characters' " and being in possession of mail belonging to other people. Mother had received notice to vacate her housing.

On July 31, 2024, MGM made a request to be named de facto parent of Minor, which was granted on August 6, 2024.

An addendum report was filed on September 24, 2024. Mother's visits with Minor were scheduled for every Wednesday for two hours. Between August 28 and September 18, 2024, Mother did not attend visits or was so late they had to be canceled. Mother visited on August 21, 2024, and her saliva test was inconclusive. Minor seemed happy to see Mother. Mother brought toys and clothes for Minor. Minor cried at the end of the visit; he wanted to stay with Mother. The Department recommended termination of Mother's parental rights based on her failure to adequately address her substance abuse, she was inconsistent in visitation with Minor and had not demonstrated an ability to provide stability and safety to Minor.

Prior to the section 366.26 hearing, Mother's counsel submitted information that Mother completed a 10-day inpatient treatment program in January 2024. Mother also participated in an outpatient program, which was completed on March 3, 2024. Mother submitted a negative hair follicle test dated March 4, 2024. Mother also submitted a transcript of her visit with Minor on August 21, 2024; Minor was crying and did not want Mother to leave the visit. Minor wanted Mother to stay with him forever. Mother told Minor that she loved him and he told her he never wanted to let go of her.

11

Mother also submitted a report of a bonding study prepared by Dr. Elizabeth Stanton. Dr. Stanton observed a visit between Mother and Minor on September 22, 2024. They met at a hotel with a small water park. Minor hugged Mother when she arrived. They both went to the water park where Mother played with Minor. Mother made sure Minor wore a life jacket. They oftentimes held hands. Minor preferred to play with Mother rather than other children who were present. After the water park, they returned to the hotel room. The room had a kitchen and Mother and Minor prepared dinner together. They sat close to each other on the couch and watched television. Minor repeatedly told Mother that he loved her. Mother helped Minor in the restroom; she helped Minor bathe and put on his pajamas. When MGM arrived to pick up Minor, he said that he did not want to say goodbye to Mother. Mother took Minor to the car. He held onto Mother and told her he loved her. Dr. Stanton concluded that Minor had a healthy and secure attachment to Mother. She concluded, "Considering the beneficial relationship that exists between them, severing contact could be detrimental."

The section 366.26 hearing was held on September 30, 2024. The juvenile court accepted the bonding study as an exhibit and the transcript and audio of the visit between Minor and Mother.

Dr. Stanton testified that Mother and Minor had a substantial positive relationship. She based this conclusion on Minor being excited to see Mother and greeting her with hugs. Minor was excited to be with Mother throughout the time they were together. They played together at the water park and he continued to invite her to play with him.

12

They constantly communicated with each other. They cooked together and he sat close to her.

Dr. Stanton believed that based on the substantial positive relationship, if there was a termination of the relationship it could "raise some concerns for the way that the child may have later experiences." Later in life, Minor may wonder if he did something to cause Mother to leave or feel a sense of loss. Dr. Stanton admitted that she observed only one visit for four hours between Minor and Mother but she believed it was enough to determine whether they were bonded. A portion of the observation took place at a water park. She admitted that a child who was crying at the end of visits and would not let the parent go could be evidence of an insecurely attached child. Dr. Stanton had not observed Minor outside the presence of Mother to see how he acted. She admitted that a parent who was the sole caregiver of a child, who is intoxicated, could be an unsafe parent. Also, a parent who misses visits but told the child they planned to visit could be a sign of an "unhealthy" parent. She did not know how long Mother had custody of Minor as opposed to MGM.

Mother testified. MGM was not close to Minor prior to MGM becoming his caregiver. Mother would try to drug test prior to the visits so did not always make it to the visits on time. MGM decided in May 2024 that she no longer wanted visits in her home. Mother insisted that once the visits were moved back to the Department, there was a lot of miscommunication and she missed visits. She blamed the Department. She also had car trouble and was sick. Prior to May 1, 2024, she was having video visits with Minor. She claimed to have been sober since January 1, 2024. Mother insisted her arrest

13

in June was due to failing to appear; these were not new cases. She had resolved the cases and was on felony probation. She admitted she had no visits in June 2024. She claimed she was unaware of a positive drug test in February 2024. The hearing was continued for further testimony.

MGM testified at the continued hearing. Mother had weekly visits with Minor up until March or April 2024. The visits then declined to a few times each month or none at all. MGM believed Minor was attached to Mother. He was always happy to see Mother. MGM initially wanted Mother to reunify with Minor and she wanted Mother to change. When Mother continued to use drugs, MGM decided it was best if she adopted Minor. Minor called her Grandma but also recently called her "Momma." MGM had custody of Minor for 30 months, which was longer than he was with Mother. Minor had drawn a family tree for school, which included MGM, himself, C.G. and S.S. Mother was not pictured. Mother had told MGM that if she was able to get back custody of Minor, she would not let him ever see MGM again. Mother had sent messages to C.G. telling him she did not care if he was her son. Minor had become less excited about video calls with Mother as he got older.

After hearing argument from Mother's counsel and counsel for the Department, the juvenile court found that the parental bond exception to termination of parental rights did not apply. The juvenile court first noted that it did not think having the bonding study occur at the water park gave a lot of insight into the bond between Mother and Minor. Any child would have a good time at a pool or water park. Dr. Stanton only observed Mother and Minor. Dr. Stanton did not speak with C.G. or MGM. The juvenile court

14

stated that it considered Dr. Stanton's opinion, but did not "give it all that much weight because I think she was almost cherry-picking the information that she wanted to rely on."

The juvenile court stated it was relying on the factors in *Caden C.* The juvenile court first found there was not consistent visitation. Mother had the opportunity for numerous visits that she missed, which were not due to any involvement by the Department. The juvenile court also noted that Mother had been convicted of felony crimes involving honesty, which negatively impacted Mother's credibility. As for the second factor in *Caden C.*, there was "clearly a strong, emotional attachment between Mother and [Minor]." The juvenile court felt that Minor was "unreasonably emotional" at the end of the August 21 visit as though Minor believed he would never see Mother again. This was not an attachment that provided him with security and stability in his life. The juvenile court also noted that Minor had been with MGM for half of his life; she had provided a safe and stable home for Minor. MGM was originally supportive of Mother regaining custody of Minor.

Finally, as to the third prong, Mother had failed to show that the detriment in severing the parent/child relationship outweighed the benefit of MGM's stable home. Minor lived with C.G. and had visits with S.S. There was no "reoccurring drug abuse and felony crimes being committed" in the home. Minor had a stable home where he could thrive. The juvenile court found that under the three prongs of *Caden C.*, Mother had not met her burden.

The juvenile court terminated parental rights and freed Minor for adoption. Mother filed her notice of appeal on October 29, 2024.

## DISCUSSION

Mother claims she had a significant bond with Minor and the juvenile court erred by failing to apply the parental bond exception of section 366.26, subdivision (c)(1)(B)(i).

" 'The objective of the dependency scheme is to protect abused or neglected children and those at substantial risk thereof and to provide permanent, stable homes if those children cannot be returned home within a prescribed period of time.' [Citation.] When the child is removed from the home, the court first attempts, for a specified period of time, to reunify the family." (*In re Celine R.* (2003) 31 Cal.4th 45, 52.) After reunification services are terminated, " 'the focus shifts to the needs of the child for permanency and stability.' " (*Ibid.*) Adoption is preferred once reunification services have been terminated because it " 'gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' " (*Id.* at p. 53.)

Under section 366.26, subdivision (c)(1), the juvenile court must terminate parental rights if it finds "by clear and convincing evidence" it is likely the child will be adopted. There are several statutory exceptions. Under section 366.26, subdivision (c)(1)(B)(i), one such exception exists where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."

16

Our Supreme Court in *Caden C.* clarified the proper application of the parental bond exception. (*Caden C.*, *supra*, 11 Cal.5th at p. 629.) The court provided an overview of the elements for applying the exception. "[T]he parent asserting the parental benefit exception must show, by a preponderance of the evidence, three things. The parent must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. When the parent has met that burden, the parental-benefit exception applies such that it would not be in the best interest of the child to terminate parental rights, and the court should select a permanent plan other than adoption." (*Id*. at pp. 636-637.)

"The first element—regular visitation and contact—is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

"As to the second element, courts assess whether 'the child would benefit from continuing the relationship.' [Citation.] Again here, the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' [Citation.] . . .

[C]ourts often consider how children feel about, interact with, look to, or talk about their parents." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

"Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption. [Citations.] Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)

The California Supreme Court also held that when it weighs whether the termination of parental rights would be detrimental, "the court is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)." (*Caden C.*, *supra*, 11 Cal.5th at p. 634.) Further, "courts should not look to whether the parent can provide a home for the child; the question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Ibid.*) Moreover, "we reject . . . that the exception can only apply when the parent *has* made sufficient progress in addressing the problems that led to dependency. Parents need not show that they are 'actively involved in maintaining their sobriety or complying substantially with their case plan' [citation] to establish the exception." (*Id*. at p. 637, fn. omitted.)

18

The California Supreme Court concluded a "subtle, case-specific inquiry is what the statute asks courts to perform: does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' [Citation.] When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Caden C.*, *supra*, 11 Cal.5th at pp. 633-634.)

"Our review of the juvenile court's ruling on whether the parental benefit exception applies incorporates both the substantial evidence and the abuse of discretion standards. [Citation.] We apply the substantial evidence standard of review to the first two elements of the exception and the abuse of discretion standard to the third element. [Citation.] 'On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order.' [Citation.] Under the abuse of discretion standard of review, we determine whether the juvenile court's decision exceeded the bounds of reason and, in so doing, we cannot substitute our view for that of the juvenile court." (*In re I.E.* (2023) 91 Cal.App.5th 683, 691.)

First, the juvenile court found that Mother had not maintained consistent visitation with Minor. Mother contends that substantial evidence supports that throughout the case, she maintained consistent visitation.

19

At the beginning of the case, the juvenile court afforded Mother supervised visits two times each week with Minor. At that time, Mother appeared to avail herself of visits and visits went well. In July and August 2023 Mother did not have visits. It was reported by the Department in November 2023 that Mother was inconsistent in her visitation and oftentimes tested positive for methamphetamine prior to the visits. Between March 2024 and May 2024 Mother had no in-person visits. Mother did have video visits with Minor during this period but it was unclear why she avoided in-person visits. Just prior to the section 366.26 hearing, Mother had missed visits from the end of August though September 2024. Although Mother claimed the missed visits were the fault of the Department, the juvenile court did not find Mother credible. (*Caden C.*, *supra*, 11 Cal.5th at p. 640 [the reviewing court does not evaluate witness credibility].)

As noted by the juvenile court, Mother had ample opportunity to visit with Minor during the dependency and missed numerous visits. Substantial evidence supported that Mother was not consistent in her visitation. Based on this court finding substantial evidence supports that Mother was not consistent in her visitation with Minor, it is unnecessary to address the remaining prongs of *Caden C.* (See *In re Eli B.* (2022) 73 Cal.App.5th 1061, 1068.) Nonetheless, we will briefly address the two remaining prongs.

Mother, relying on the bonding study, contends there was a substantial positive attachment with Minor. Here, the juvenile court criticized the bonding study. The juvenile court had the discretion to give whatever weight it deemed appropriate to the bonding study. Although the juvenile court ordered that MGM make Minor available for a bonding study, the bonding study was not ordered by the juvenile court. The expert

was hired by Mother. The juvenile court found that there was an attachment between Minor and Mother but was concerned that it was not a healthy attachment. It appeared that Minor was concerned he would never again see Mother at the end of visits. Further, the juvenile court noted that Minor had spent more time in MGM's custody than with Mother. (*In re Autumn N.* (1994) 27 Cal.App.4th at p. 576.) The juvenile court could reasonably reject the findings by Dr. Stanton and find that there was not a healthy, positive attachment between Mother and Minor.

Even if we were to conclude that there was a positive attachment between Mother and Minor, the juvenile court did not abuse its discretion by finding that Mother had failed to meet her burden of showing that severing the bond between her and Minor outweighed the stability of the adoptive home. As noted by the juvenile court, Minor was thriving in MGM's home and lived with his sibling. The juvenile court reasonably expressed concern that outside of MGM's home, there was the possibility of Minor being exposed to drug use and criminal activity. While Minor and Mother did appear to have a bond, it was not shown that severing that bond would be detrimental to Minor in light of the stable home provided by MGM. This determination was certainly supported by the fact that Minor had drawn a family tree for school that included MGM, himself, C.G. and S.S., but Mother was not pictured. The juvenile court did not abuse its discretion by concluding—having been involved in the dependency case since its inception—that the third element of *Caden C.* was not met.

**DISPOSITION**

The juvenile court's order terminating Mother's parental rights and freeing Minor for adoption is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
Acting P. J.

We concur:

CODRINGTON
J.

MENETREZ
J.

22